UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE,

       Plaintiff,

  v.

LAKE WILDWOOD ASSOCIATION,
WILLIAM CHRISTOFFERSON, and
WILLIAM HAUSHALTER,

       Defendants.

NO. CIV. S-06-1026 WBS EFB

MEMORANDUM AND ORDER RE:
MOTION TO DISMISS

----oo0oo----

       Based on alleged discharges of "wastewater" into Deer Creek and the Yuba River, plaintiff California Sportfishing Protection Alliance filed suit against defendants Lake Wildwood Association ("the Association"), William Christofferson, and William Haushalter, alleging violations of a National Pollution Discharge Elimination System ("NPDES") permit issued by the California Regional Water Quality Control Board for the Central Valley Region ("the Board"). Defendants move to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons,

1

1 defendants' motion will be granted.

2 I.   Factual and Procedural Background

3   In June 2000, under the power granted by the NPDES 4 permit program,[1] the Board adopted a general order setting the 5 waste discharge limits for "low threat and dewatering wastewater 6 discharges."  (Pl.'s Req. for Judicial Notice ("RJN") Ex. A.) 7 Plaintiff, a non-profit public benefit corporation based in 8 Stockton, California, asserts that defendants, the persons 9 responsible for the upkeep of the artificially formed Lake 10 Wildwood, have violated and will continue to violate the terms of 11 that permit through their annual maintenance activities.  (Compl. 12 ¶¶ 6, 31, 33.)  Specifically, plaintiff alleges that defendants' 13 release over a dam (spillway) of "several hundred acre feet of 14 water from Lake Wildwood" results in pollution that exceeds the 15 limits established in General Order No. 5-00-175/NPDES No. 16 CAG995001 ("the order/permit").[2]  (Id. ¶¶ 13, 33.)

17   Indeed, according to plaintiff, the post-discharge 18 reports that defendants have filed with the Board from 2000-2004 19 reveal that defendants have discharged water "containing levels 20 of turbidity, temperature, and pollutants in excess of the

---

[1] Congress created the NPDES permit program as part of the Clean Water Act ("CWA") and thereby authorized the Environmental Protection Agency ("EPA") and state agencies with approved water quality programs to "regulate[] point sources of pollution that reach the waters of the United States."  33 U.S.C. § 1342(a)-(b); County Sanitation Dist. No. 2 v. County of Kern, 127 Cal. App. 4th 1544, 1562 n.18 (2005).  "[O]n May 14, 1973, California became the first state to be approved by the EPA to administer the NPDES permit program."  Id., 127 Cal. App. 4th at 1565-66; 39 Fed. Reg. 26,061 (July 16, 1974).

[2] The purpose of this release, or "drawdown" of the lake, was to lower the lake's level to allow for removal of sediment and vegetation.  (Compl. ¶ 33.)

2

1  Order's Effluent Limitations . . . ." (Id. ¶ 36.)  As a result,
2  Deer Creek and the Yuba River ("the receiving waters") have
3  experienced an increase in ambient temperature and a decrease in
4  oxygenation, which negatively impacts the life cycles of fish and
5  other wildlife. (Id. ¶ 37.) Additionally, the discharges
6  contain high levels of fecal coliform bacteria, which threaten
7  human recreation activities. (Id. ¶¶ 37, 43.) Plaintiff further
8  alleges that defendants have failed to monitor and record the
9  impact of their operations on total suspended solids ("TSS"),
10 Biological Oxygen Demand ("BOD"), and pH in the receiving waters,
11 all in violation of the requirements of the order/permit. (Id. ¶
12 44.)
13          In light of these alleged violations, plaintiff has
14 taken the appropriate steps to bring a Clean Water Act ("CWA" or
15 "the Act") citizen's suit against defendants to enforce the NPDES
16 permit for dewatering activities.  33 U.S.C. § 1365(a)(1)
17 (authorizing citizen suits).  On January 17, 2006, plaintiff
18 provided several federal and state agencies with "notice of
19 Defendants' violations of the Act, and of its intention to file
20 suit against Defendants . . . ." (Compl. ¶ 3); see also 33
21 U.S.C. § 1365(b)(1)(A) (requiring plaintiffs to give 60 days
22 notice to designated entities before filing a citizen's suit
23 under the act).  Plaintiff alleges that none of the agencies
24 authorized to litigate this matter elected to do so. (Id. ¶ 4.)
25 Accordingly, plaintiff filed this suit on May 10, 2006 alleging
26 violations of sections 301(a) and 402 of the CWA (33 U.S.C. §§
27 1311, 1342).  Defendants now move to dismiss the complaint,
28 arguing that they are not subject to an existing NPDES permit and

3

that their activities do not require a permit.

II.  Discussion

    A.  Legal Standard

On a motion to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the pleader. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Cruz v. Beto, 405 U.S. 319, 322 (1972). The court may not dismiss for failure to state a claim unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Van Buskirk v. CNN, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Dismissal is appropriate, however, where the pleader fails to allege facts that support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988); see also Conley v. Gibson, 355 U.S. 41, 47 (1957) (complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

In general, the court may not consider material other than the facts alleged in the complaint when deciding a motion to dismiss. Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996) ("A motion to dismiss . . . must be treated as a motion for summary judgment . . . if either party . . . submits materials outside the pleadings in support or opposition to the motion, and if the district court relies on those materials."). However, the court may consider extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document . . . ." Knievel

4

1  v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).  Additionally, the
2  court may consider materials of which it may take judicial
3  notice, including matters of public record.  Mir v. Little Co. of
4  Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988); Fed. R. Evid.
5  201(b) (defining the scope of judicial notice); see also Mack v.
6  S. Bay Beer Distribs., 798 F.2d 1279, 1282 (9th Cir. 1986)
7  (noting that reliance on matters of public record "does not
8  convert a Rule 12(b)(6) motion to one for summary judgment"),
9  abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v.
10 Solimino, 501 U.S. 104 (1991).  Because the additional materials
11 submitted by the parties in support of and opposition to this
12 motion (the Board's orders and notices as well as the EPA's
13 proposed rules) are matters of public record, the court may
14 consider them here.
15      B.   Defendants' Obligations Under an Existing NPDES Permit
16           An action to enforce a NPDES permit necessarily depends
17 on the validity of the permit.  Gwaltney of Smithfield, Ltd. v.
18 Chesapeake Bay Found., Inc., 484 U.S. 49, 59 (1987)  ("A citizen
19 suit may be brought only for violation of a permit limitation
20 'which is in effect' under the [CWA].") (citing 33 U.S.C. §
21 1365(f)).  The NPDES general permit that defendants have
22 allegedly violated, and will continue to violate, expired on June
23 1, 2005.  (Pl.'s RJN Ex. A at 9 ("This Order expires on 1 June
24 2005.").)  Despite this explicit expiration date on the face of
25 the general permit, plaintiff contends that state and federal law
26 dictate that the permit's terms and conditions are automatically
27 extended.
28           Under the regulation cited by plaintiff, "[t]he terms

and conditions of an expired permit are automatically continued pending issuance of a new permit if all requirements of the federal NPDES regulations on continuation of expired permits are complied with." Cal. Code Regs. tit. 23, § 2235.4 (2006). The federal NPDES regulations referred to provide that an expired permit will "continue in force under 5 U.S.C. § 558(c) until the effective date of a new permit" if (1) the permitee has submitted a timely and complete application for a new permit and (2) the permitting authority fails to issue a new permit before the expiration date of the previous permit. 40 C.F.R. § 122.6(a) (2006). In turn, 5 U.S.C. § 558(c) provides that "[w]hen application is made for a license required by law, the agency . . . within a reasonable time, shall set and complete proceedings required to be conducted. . . ."

From the plain language of these statutory provisions, they do not appear to be applicable to a general permit like the one at issue here. The purpose of a general permit is to "cover one or more categories or subcategories of discharges . . . within a geographic area." 40 C.F.R. § 122.28(a)(1) (2006). Thus, general permits are not issued in response to any individual's application, but instead at the discretion of the Director of the EPA or state permitting authority. § 122.28(a) ("The Director <u>may</u> issue a general permit. . . .") (emphasis added); § 123.25(a)(11) (granting states the discretion to implement the general permit program). By contrast, individual NPDES permits are issued to particular parties, who are engaged in the potentially illegal discharge of pollutants, and are therefore required to apply for a permit. § 122.21(a)(1) ("Any

6

person who discharges or proposes to discharge pollutants . . . and does not have an effective permit, must submit a complete application to the Director in accordance with this section.").

Thus, in § 558(c), the language "required by law" refers to the agency's obligation under that section to "complete[] in an expeditious and judicious manner" any "adjudicatory hearings mandated under other provision of law."[3] Marathon Oil Co. v. EPA, 564 F.2d 1253, 1260 n.25 (9th Cir. 1977). The obligatory language found in § 558(c) has no relevance, however, when the original impetus for considering a permit is purely discretionary, as with a general permit.[4] The lack of any parallel provisions for general permits indicates a clear intention that extension of such permits is not governed by this section. Kitlutsisti v. Arco Alaska, Inc., 592 F. Supp. 832, 843 (D. Alaska 1984), vacated as moot, appeal dismissed, 782 F.2d 800 (9th Cir. 1986) ("Section 558(c), however, does not allow for the extension of a NPDES general permit.").

Moreover, both of these statutory provisions emphasize that continuation of a permit is contingent upon an application for renewal or a new license. § 558(c) ("When the licensee has made timely and sufficient application for a renewal or a new license[,] . . . a license . . . does not expire until the application has been finally determined by the agency."); §

---

[3] The purpose of this provision is to protect license applicants, engaged in the otherwise illegal discharge of pollutants, from facing permit expiration due to administrative delay.

[4] The plain language of the EPA's provisions echo this same distinction, as they allow for permit continuation only when a "permitee" has submitted a timely application. § 122.6(a)(1).

7

122.6(a)(1) ("[T]he conditions of an expired permit continue in force . . . if: (1) [t]he permitee has submitted a timely application which is a complete application for a new permit.") (citations omitted). Significantly, there is no process for an "application" for a general NPDES permit, since the decision to issue one lies solely within the discretion of the EPA or the state permitting authority. Therefore, the relevant statutory authority does not indicate that this general order should continue in perpetuity, and the effect of its terms and conditions ceased as of its June 1, 2005 expiration date.[5]

Consequently, plaintiff cannot base its claims on a violation of General Order No. 5-00-175/NPDES No. CAG995001. Plaintiff is only authorized to prosecute suits "against any person . . . who is alleged to <u>be</u> in violation of . . . an order issued by the Administrator or a State with respect to [an effluent] standard or limitation." 33 U.S.C. § 1365(a)(1)(B) (emphasis added); <u>see also</u> <u>Gwaltney</u>, 484 U.S. at 59 ("[T]he interest of the citizen-plaintiff is primarily forward-looking."). In other words, because a citizen suit must be based on a permit which "is in effect," plaintiff has no cause of action against defendants for a violation of the expired

---

[5] Plaintiff additionally contends that defendant conceded that it is subject to an existing NPDES permit. (Pl.'s Opp. to Mot. to Dismiss 1:18-19, 7:9.) The court finds this claim unconvincing. The only language cited to by plaintiff in support of this argument is defendants' admission "[t]hat the association submitted an application to be covered under Order No. 5-00-175 . . . ." (Defs.' Reply to Opp. to Mot. to Dismiss 4 n.1.) This admission, however, refers merely to defendants' application for coverage under the order <u>at a time when it was still in effect</u>. In no way does this speak to whether defendants' discharges currently "<u>are</u> subject to an existing NPDES permit . . . ." (Defs.' Mot. to Dismiss 1:18-19) (emphasis added).

8

permit/general order.  Id. at 59 (citing 33 U.S.C. § 1365(f)); id. at 67 (holding that a citizen-plaintiff cannot "maintain an action based on wholly past violations of the Act").

    C.    <u>Defendants' General Obligations Under the NPDES Program</u>

However, this fact does not settle the matter before the court, because plaintiff can still file a citizen's enforcement suit under the CWA if defendants are engaged in an activity that requires an NPDES permit.  See 33 U.S.C. § 1365(a)(1)(A), (f) (authorizing citizen suits against any person who is alleged to have committed "an unlawful act under subsection (a) of section 1311 of this title"); id. § 1311(a) (making illegal "the discharge of any pollutant by any person"); <u>Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.</u>, 299 F.3d 1007, 1012 (9th Cir. 2002) (holding that a state agency's determination that the defendant does not discharge pollutants from a point source, and thus does not require an NPDES permit, does not bar a "citizen's otherwise proper federal suit to enforce the Clean Water Act").

At issue is § 301(a) of the CWA, which "makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act," such as section 402, which permits the Administrator of the EPA and/or authorized state agencies to "issue permits authorizing the discharge of pollutants in accordance with specified conditions."  <u>Gwaltney</u>, 484 U.S. at 52 (citing 33 U.S.C. § 1342).  As defendants correctly emphasize, however, discharges that require an NPDES permit must <u>add</u> pollutants to the waters of the United States. 33 U.S.C. § 1362(12).

Moreover, an NPDES permit is required only when someone seeks to discharge pollutants from a "point source"--specifically "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (definition of "point source"); 33 U.S.C. § 1362(12) (definition of "discharge of any pollutant"); League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren, 309 F.3d 1181, 1183 (9th Cir. 2002). Nonpoint source pollution "is regulated in a different way and does not require [an NPDES] permit . . . ." Id.; Or. Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1096 (9th Cir. 1998) ("Nonpoint source pollution is not regulated directly by the Act, but rather through federal grants for state wastewater treatment plans."); Envtl. Prot. Info. Ctr. v. Pac. Lumber Co., 301 F. Supp. 2d 1102, 1105-06 (N.D. Cal. 2004) ("Unlike 'point sources,' 'nonpoint sources' are regulated indirectly: The CWA directs EPA to disseminate information regarding nonpoint pollution sources . . . ." (citing 33 U.S.C. § 1314(f))).

Reduced to a more concise test, the aforementioned provisions of the CWA require an NPDES permit whenever someone "(1) discharge[s], i.e., add[s] (2) a pollutant (3) to navigable waters (4) from (5) a point source." Comm. To Save Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, 308 (9th Cir. 1993). Defendants concede that the alleged pollutants in this case--sediment, heat, and fecal coliform bacteria--qualify as

10

1  "pollutants" under the act.  See 33 U.S.C. § 1362(6) ("The term
2  'pollutant' means dredged spoil, . . . biological materials, . .
3  . heat, . . . rock, [and] sand . . . discharged into water.").
4  Likewise, they do not contend that the receiving waters are not
5  navigable waters.  The questions remaining for the court then are
6  (1) whether the release of water through the dam "adds"
7  pollutants to the receiving waters; and (2) whether the dam
8  constitutes a point source.

9       Defendants rely on National Wildlife Federation v.
10 Gorsuch, 693 F.2d 156 (D.C. Cir. 1982), and National Wildlife
11 Federation v. Consumers Power Co., 862 F.2d 580 (6th Cir. 1988),
12 for the proposition that "there is no addition[, as required by
13 the CWA,] 'unless a source "physically introduces a pollutant
14 into the water from the outside world."'" (Defs.' Mot. to Dismiss
15 6 (quoting Consumers Power, 862 F.2d at 584 (quoting Gorsuch, 693
16 F.2d at 174-75)).)  The courts held in both cases that the EPA's
17 decision to define "addition" as the "physical[] introduc[tion
18 of] a pollutant into water from the outside world" deserved
19 considerable deference.  Gorsuch, 693 F.2d at 161; Consumers
20 Power, 862 F.2d at 584.  With this definition in mind, the courts
21 concluded that the water quality changes associated with dams
22 (e.g., increased turbidity, decreased oxygenation) were not
23 "discharge[s] of a pollutant" because the structures themselves
24 did not "introduce" anything into the water that was not already
25 present.  Accordingly, the EPA was not required to issue NPDES
26 permits.  See also S.D. Warren Co. v. Maine Bd. of Envtl. Prot.,
27 126 S. Ct. 1843, 1850 (2006) ("[S]omething must be added in order
28

to implicate § 402 . . . .").[6]

Adopting this reasoning, the inquiry into whether something has been introduced from the "outside world" centers around whether the source and receiving waters are actually the same body of water. See Catskill, 273 F.3d at 492 (analogizing that if one "takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot . . . ."). For an "addition" of a pollutant from the "outside world" to occur, Lake Wildwood and the receiving waters in this case must be "distinct" bodies of water. See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 110-11 (2004)(holding that if a district court determines that the source and the receiving waters "are not meaningfully distinct water bodies", then the alleged discharger "will not need an NPDES permit").

There is no clear legal test for determining whether two bodies of water are distinct, but several courts have suggested that if the upstream and downstream bodies of water would naturally comprise one uninterrupted flow but for the artificial interruption, then they are not sufficiently "distinct." Cf. Miccosukee Tribe, 541 U.S. at 112 (observing

---

[6] Plaintiff criticizes the deference given to the EPA's reasoning in Gorsuch and Consumers Power, citing Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 489-90 (2nd Cir. 2001), for the proposition that "deference should not be accorded proposed agency rules." (Pl.'s Opp. to Mot. to Dismiss 9 n.3.) As the Catskill court itself made clear, however, "courts do not face a choice between Chevron deference and no deference at all. . . . [T]he agency position should be followed to the extent persuasive." Catskill, 273 F.3d at 491, citing United States v. Mead Corp., 533 U.S. 218, 235 (2001).

1  that some courts have held that if the transfer of water from one
2  "body" of water to another would happen naturally, absent some
3  artificial transfer, then the waters are not distinct, but rather
4  "are two hydrologically indistinguishable parts of a single water
5  body" and logically, pouring some of one water into the other
6  cannot "add" anything); see also Catskill, 273 F.3d at 492
7  (distinguishing Gorsuch and Consumers Power because "[in
8  Catskill] the water is artificially diverted from its natural
9  course . . . .").

10         In general, the weight of authority specific to dams
11 counsels that water behind and in front of a dam are not
12 "meaningfully distinct."   See Catskill, 273 F.3d at 491
13 (discussing Gorsuch and noting that "[t]he reservoir above the
14 dam and the stream below, at least arguably, were sufficiently
15 the 'same' water") (emphasis added).  The Supreme Court has
16 additionally found this analysis to be persuasive. S.D. Warren,
17 126 S. Ct. at 1850. ("Before Miccosukee, one could have argued
18 that transferring polluted water from a canal to a connected
19 impoundment constituted an 'addition.'  Miccosukee is at odds
20 with that construction of the statute . . . .").  Indeed, in this
21 case plaintiff concedes in its complaint that the lake "is
22 artificially formed by a dam that interrupts the natural flow of
23 Deer Creek."  (Compl. ¶ 31 (emphasis added).)  Undoubtedly, but
24 for the dam, the creek would flow uninterrupted.

25         Accordingly, this court concludes that the release of
26 water from Lake Wildwood over the dam does not constitute the
27 ///
28 ///

1  "addition" of pollutants for which defendants are required to
2  have an NPDES permit.[7]
3         IT IS THEREFORE ORDERED that defendants' motion to
4  dismiss be, and the same hereby is, GRANTED.
5  DATED:  September 24, 2006

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[7] Additionally, it doubtful that the dam in this case can be considered a "point source" under the NPDES program. Cf. 33 U.S.C. § 1314(f)(2)(F) (creating a non-NPDES method of controlling pollution caused by "changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams. . . ."); see also Gorsuch, 693 F.2d at 175 (noting that "Congress had no occasion to consider whether NPDES permits were desirable for dams . . . ."). But see id., at 165 n.22 (noting that pipes and spillways of dams could perhaps operate as point sources if their operation results in "the discharge of grease, oil, or trash . . . ."). Regardless, the court need not reach the issue.

14